## MERKLE *v.* STATE TAX COMMISSION

Harold Banta, of Banta, Silven & Young, Baker, argued the cause and filed a brief for plaintiffs.

Walter J. Apley, Assistant Attorney General, Salem, argued the cause and submitted briefs for the defendant.

Decision rendered December 3, 1965.

LYLE R. WOLFF, Judge (Pro Tempore).

This appeal has come before the court as a result of the commission's disallowance of losses claimed by the taxpayers on their 1961 joint Oregon income tax return.

The losses were claimed in connection with property received from the Estate of Kurt G. Hirsch, deceased, in Grant County, by Mrs. Eunice Merkle, formerly Eunice MacGillivray, as the residuary beneficiary under the will of the decedent. Eunice Merkle, under the will, was entitled to the entire estate, except for minor specific bequests to Walter G. Hirsch, surviving brother of the decedent. The brother contested the will on the grounds of undue influence and lack of testa-

mentary capacity. The contest in the Grant County Circuit Court, if successful, would have resulted in intestacy. Since Mrs. Merkle was not a relative of the decedent, the decedent's brother, as heir, would have received the entire estate. Mrs. Merkle individually paid the decedent's brother the sum of $8,475.00 in settlement, and the contesting brother thereupon relinquished and waived his claim to the estate. She also paid legal expenses of $2,113.60 to her attorneys, Banta, Silven, Horton & Young, out of her own funds for defending her rights in the will contest. Plaintiffs at the time of the hearing abandoned their claim of deductibility of the legal expense.

The estate paid the estate inheritance tax upon, and Mrs. Merkle ultimately received, the residuary estate assets, excepting only the specific bequests to the surviving brother, without any deduction for the sum paid in settlement of the will contest.

The only issue is whether the settlement payment is an expenditure deductible as a loss on the 1961 joint income tax return by Mrs. Merkle as beneficiary of the estate. In preparing that return, the payment was pro-rated among the assets received by Mrs. Merkle, which consisted of cash, mortgages, notes, and a limited amount of real property. The item disallowed by the Commission is the loss claimed as attributed to cash, mortgages and notes. The problem is finding the specific income tax provisions defining and authorizing deductible losses, and seeking such case law as may assist the Court in applying these provisions to the facts of this case.

The classes of deductible losses are enumerated in ORS 316.320(1) (a), (b) and (c), providing as follows:

"In computing net income there shall be allowed as

deductions, losses sustained during the tax year and not compensated for by insurance or otherwise:

(a) If incurred in trade or business.

(b) If incurred in any transaction entered into for profit, though not connected with the trade or business.

(c) Of property not connected with the trade or business, if arising from fire, storm, shipwreck or other casualty, or from theft.

\* \* \* \* \*''

The plaintiffs in their complaint appear to claim a loss under ORS 316.320(2). Unfortunately, subsection (2) does not add an additional class of deductible losses, but merely describes the method of computing the basis for determining the amount of deductions for losses, if any, sustained under subsection (1) of ORS 316.320. Furthermore, no consideration of ORS 316.266(6) and ORS 316.270(2) is required, unless it is first determined that there exists a deductible loss within the three general classes described in subsection (1) of ORS 316.320. No citation has been suggested that the settlement payment falls within the categories described in subsection (1) of ORS 316.320. On the contrary, plaintiffs in their brief stated that "these expenditures are not claimed as a 'loss deduction', but as a capital expenditure to be added to the basis of the property and recovered on its subsequent liquidation." It would seem that the settlement payment lies outside the scope of the authorized deductible losses.

■ It is fundamental that losses are deductible for tax purposes only when authorized by statute. *Estate of Eleanor D. Erdman, Deceased, et al v. Commissioner,* 37 TC 1119 (1962); *Estate of Dietz v. Commissioner,* 16 TC Memo, 482 (CCH 1957); *Brown v. Commissioner,* 19 TC 87 (1952); *W. Thomas Menefee and*

*Florence E. Menefee v. Commissioner,* 8 TC 309 (1947); *Clara A. McKee v. Commissioner,* 19 BTA 430 (1930).

Plaintiffs apparently complain of inconsistency between the inheritance and income tax systems. Such inconsistency may exist, but the consequences of the enforcement of the tax statutes in the two fields result from the legislative enactments. The legislature, not the court, is the architect of the statutes, and is solely responsible for the designation and selection of the means and methods of raising revenue and of the persons and subject matter to be affected thereby. Attempting to eliminate possible inconsistencies arising out of the application of the statutes embodied in the two systems is in many cases an irrelevant factor in the judicial consideration of a case and tends merely to obfuscate the judicial task of applying specific provisions of the income tax law. Neither the validity nor the usefulness of such factor in the judicial process has been demonstrated for this case.

The cases and authorities of *Lyeth v. Hoey,* 305 US 188, 59 S Ct. 155, 83 L. Ed. 119, 119 A.L.R. 410 (1938); *In re Cook* (New York), 79 N.E. 991; *Hartung v. Unander,* 224 Or 165, 169-171, 355 P2d 738 (1960); Opinions of the Attorney General, 1946-48, pp. 182-3, No. 26; 28 Am. Jur. *Inheritance, Estate and Gift Taxes,* §§ 109 and 110, pp. 87-88; discussed by counsel, seem to touch upon factual situations and statutes not involved in this case, and also indicate the improbability of any successful judicial undertaking to achieve consistency.

Statutory differences and separate theories distinguish the systems of inheritance tax and income tax in Oregon. *Belton v. Buesing,* 240 Or 399, 629, 402 P2d 98 (1965). It is futile often to expect to find

referable concepts and consistency in the two systems. These taxation systems have different policy thrusts and apply to their respective subject matters in ways peculiar to their own designs, producing sometimes disparate and irreconcilable consequences.

■ The Court concludes there are no circumstances present to justify extending the categories of deductible losses described in subsection (1) of ORS 316.320 to include the settlement payment. The remedy, if any, probably must be sought from the tax law creator, the legislature.

The Order of the Commission is affirmed.

ON REHEARING

Harold Banta, of Banta, Silven & Young, Baker, argued the Motion on Rehearing and filed briefs for plaintiffs.

Walter J. Apley, Assistant Attorney General, Salem, argued against the motion for rehearing and submitted a brief for the defendant.

Decision modifying order of State Tax Commission rendered January 7, 1966.

LYLE R. WOLFF, Judge (Pro Tempore).

The plaintiffs in their motion to reconsider and modify the decision rendered herein on December 3, 1965, ask the court to hold that the amount of $8475.00 paid in settlement of the Kurt G. Hirsch will contest was deductible as a capital loss under ORS 316.320(1) (b), and to pass upon the fundamental proposition of whether the amount so paid in settlement of the will contest was a capital expenditure, to be added to the unadjusted basis as fixed by the estate appraisers (ORS 316.266(6)) in determining the adjusted basis (ORS 316.270(2) (a)) so as to establish a capital loss on the estate's assets in connection with their ultimate disposition or liquidation. In the court's prior decision, it was held that the settlement payment could not be deducted by the taxpayer-beneficiary in the taxable

year of 1961 for the reasons stated therein and based upon the posture of the case then submitted to the court.

Plaintiffs, in their brief supporting the motion to reconsider, stated that none of the points to be considered on this motion were discussed either in the oral argument or in plaintiffs' memorandum brief at the time of the first hearing. Plaintiffs stated that the way the proceeding had developed before the administrative levels of the tax commission, plaintiffs did not consider the issues now being raised in this motion to reconsider seriously involved at the time of the first hearing before this Tax Court.

Detailing the history of the proceeding and the issues successively considered by the auditor, the director and the commission up to the time this case reached the Tax Court is necessary to understand why the plaintiffs did not at the first Tax Court hearing assert their contention that the settlement payment was deductible as a loss under ORS 316.320(1) (b).

The present case originated from a notice of deficiency and proposed assessment dated May 18, 1964, with a State Tax Commission auditor's report attached thereto. The net deficiency was $984.72. So far as it touches upon the cash, notes and mortgages involved in this case, the auditor's explanation of the disallowance of the loss attributable to the foregoing items was couched in these words: "Expenditures incurred in protecting or asserting one's rights to property of a decedent as heir or legatee are not deductible expenses. Accordingly, it appears the loss claimed in connection with the Hirsch estate would not be deductible. ORS 316.266(6)". The amount of the disallowance was $9977.63.

To this proposed assessment, the taxpayers sub-

mitted written objections and therein requested a conference under date of June 13th, 1964. In their request for a conference, the taxpayers, through their counsel, contended:

"The proposed assessment was in error. The Hirsch estate will contest was compromised and the will sustained. In effecting this result, Mrs. Merkle, the primary beneficiary under the will, paid $8475.00 in settlement and incurred legal expense amounting to $2113.60. Mrs. Merkle was a non-relative to the decedent, and the sum she paid in settlement went to a relative. The first consideration was that the inheritance taxes should be entitled to the reduced rate on the portion paid to the relative. However, the Attorney General, by Opinion No. 276, 1946-48, pgs. 182-3, has ruled squarely upon the point, stating that the property passes under the will and is taxable on that basis, regardless of any amounts paid to compromise and settle the claims of contestants.

I

Accordingly, the legal expense and payment in compromise would necessarily have to be treated as a capital expenditure and in protecting the inheritance it would be added to the basis of the property acquired. In connection with the cash asset, the pro-rata portion becomes an expense in order to effect collection, and the same would apply with respect to the notes and mortgages and the real estate."

Following the conference, and on November 12, 1964, the protest was rejected and notice of tax deficiency assessment issued, with explanatory letter from the Director, Income Division, which in part reads as follows:

"The basic issue presented for my consideration was whether certain expenses incurred in contesting the will were properly deductible as expenses or

as capital expenditures. It is my finding that the expenditures as disallowed by the Audit Section were not deductible as expenses, nor could they be considered capital expenditures. The settlement that was paid to the will contestant would merely be considered a reduction in the amount taken by the beneficiary under the will. It is clear under the authorities that a settlement beneficiary takes by inheritance and the party surrendering an interest has in effect never acquired a fixed interest in the property which would be given any basis."

The Merkles then filed a petition on appeal to the State Tax Commission.

The tax commission, following a hearing at which the same evidence (the original file in the Kurt G. Hirsch estate) was presented as originally submitted to the Tax Court at the first hearing of the Tax Court, then entered the order of March 8, 1965, from which the present appeal to the Tax Court was prosecuted. The opinion and order of the commission contained these recitals:

"The effect of these proceedings [meaning the will contest in the probate and the settlement payment made to the contestant] was to reduce the expectancy of Mrs. Merkle by the extent of the will contest and settlement expenditure. In preparing the 1961 tax return, the will contest expenditures were pro-rated among the assets received by Mrs. Merkle, which consisted of cash, mortgages, notes, and a limited amount of real property. The item which is contested is the disallowance by the auditor of the loss claimed as attributed to the cash and the mortgages and notes. * * *

"The Commission is of the opinion that the tax-payer-beneficiary, Mrs. Eunice Merkle, cannot claim any basis in property that she did not actually receive from the estate. It has been established since the case of *Lyeth v. Hoey*, 305 U.S. 188, 59 S. Ct.

155, 83 L. Ed. 119 (1938), that the statutory exemption for amounts received by bequest, devise or inheritance is also applicable to an amount received by an heir in settlement of a will contest. To allow in this case a basis to Mrs. Eunice Merkle would be in effect allowing two basis (sic) to the same property, since the party actually receiving the settlement would also be receiving property from the estate by inheritance.

"The Commission is aware that it is well settled that expenditures of this nature, and particularly the legal fees paid are considered as capital expenditures, but this does not mean that a beneficiary is automatically entitled to a loss deduction. To the contrary, losses are allowed only where authorized by statute, and the principal authority under Oregon law, ORS 316.320, make (sic) it apparent that the taxpayer is not entitled to claim the loss under any of the provisions of this statute.

"As it has been pointed out in several federal cases a taxing statute is concerned with realized gains and losses, and where the taxpayer merely fails to receive something that has not first been reduced to possession, no loss has been occasioned. (Pearl A. Long, 35 BTA, 479, 96 F. 2d, 270; cert. denied, 305 U.S. 616; W. Thomas Menefee and Florence E. Menefee v. Commissioner, 8 TC, 309; Clara A. McKee v. Commissioner, 19 BTA, 430)".

Having abandoned the claim of the deductibility of the legal expense at the time of the first hearing for the reasons hereinafter stated, taxpayers are now concerned solely with the contention that a proportionate share of the settlement payment should be deductible as a loss pursuant to ORS 316.320(1) (b).

For the purposes of this motion to reconsider, the parties stipulated the facts and the records to be received in evidence. The parties also agreed that all new or other issues deemed important by the court to a

full determination of this controversy may be determined by the court in this proceeding, without remand to the commission. ORS 305.425.

The parties stipulated as follows:

"* * * Kurt G. Hirsch, deceased, was past seventy years of age at the time of his death. Since his retirement at age sixty-five, his sole business activity consisted of making loans to various individuals, occasionally upon unsecured note, but generally upon notes secured by real or chattel mortgage. The interest accruals upon these notes constituted his sole source of income other than his social security and similar retirement benefits. The checking account which he maintained in the Grant County Bank at John Day, Oregon, was utilized in connection with this loaning business. He habitually maintained a substantial balance in order that funds would be available to loan as needed, and payments of principal and interest as received were deposited back into the checking account. The legatee, Eunice Merkle, proceeded, immediately upon distribution being directed on August 7, 1961, to collect and reduce to possession the amount in the checking account, and upon the notes and mortgages being turned over to her, endeavored to collect the same as rapidly and to the fullest extent possible.

"Second: The actual disposition of each of the notes and mortgages listed in the inventory and appraisement of the Kurt G. Hirsch Estate was as follows:

"(1) Dick Clamfield, paid in full December 7, 1964.

"(2) Dean Downing—Chattel mortgage on trailer house. This was taken over on foreclosure after the estate was closed in 1961. It was subsequently resold by Mrs. Merkle for $625.00 in 1962. She took and reported a further loss on the resale of $1029.42 in her 1962 state income tax return. The breakdown detail listed the item as, Trailer house—mortgage acquired 1961, sold 1962, gross

sales price $625, cost $1,654.42 (balance due at time of foreclosure), loss $1029.42.

"(3) Ivan E. Olsen, paid off in full on November 21, 1961.

"(4) Vance Drew, no value on inventory and no part ever paid.

"(5) Rex Brisbois, paid off on October 18, 1960, prior to closing estate. Payments show in final account and the amount received was turned to Mrs. Merkle as part of the bank balance.

"(6) Leo Pankey. Nothing has been paid on either the unsecured note or the real mortgage. Both notes are still outstanding.

"(7) Herman Hendricks, paid off in full on March 1, 1962.

"(8) William Choate, paid off in full on October 9, 1963.

"(9) James Moulton, paid off on October 13, 1961.

"(10) Earl Steagall, paid off on October 10, 1961.

"(11) Glenn Tracy has not yet been paid off. Only $25 has been paid on the principal and the note and mortgage still remain outstanding."

The records received in evidence establish the following additional facts:

Kurt G. Hirsch died July 6, 1960. Letters Testamentary issued to the executrix, Eunice McGillivray, now Eunice Merkle, the taxpayer-beneficiary, on July 12, 1960. The final account and report was filed June 27, 1961, and was approved on August 7, 1961.

That final account and report shows under the receipts exhibit the amount of $22,043.21 received by the executrix during the course of the administration of the estate to the date of the filing of the report. This sum was made up of the $17,775.81 in the decedent's checking account in the Grant County Bank

at the time of his death, the sum of $3.00 in currency in the billfold of the decedent, the sum of $255.00 in the form of a social security death benefit paid by the United States Treasurer, and, lastly, the sum of $4009.40, which last amount represented the total of the sums paid by various debtors of the decedent during the course of the administration of the estate until June 27, 1961, upon the notes and mortgages owing to the decedent at the time of his death. From the total of these receipts were deducted total disbursements in the amount of $7754.78, leaving a cash balance in the account of the executrix in the amount of $14,288.43.

The bank statements in the probate file show additional deposits made from June 27, 1961, to August 3, 1961, in the amount of $416.80, presumably payments on the notes and mortgages. Additional disbursements made by the executrix during the course of the administration of the estate, as shown in the estate checking account, include inheritance tax in the amount of $3601.12, paid to the State Treasurer, real property taxes in the amount of $43.72, paid by the executrix for the fiscal year of 1959-60, on the Seneca property in Grant County, additional inheritance tax in the amount of $154.10, paid to the State Treasurer, and, lastly, the sum of $15.60, paid to the Blue Mountain Eagle for the publication of the final notice, totaling the sum of $3814.54.

The summary of the transactions of the estate checking account reveals (1) receipts shown on final report to date of filing, $22,043.21; and (2) receipts thereafter to date of closing of account, $416.80, totaling the sum of $22,460.01. Disbursements from that account reveal (1) disbursements shown on final account, $7,754.78, and (2) additional disbursements

shown by checks and bank statements, $3,814.54, making total disbursements in the amount of $11,569.32.

The difference between the receipts and the disbursements was a balance of $10,890.63 in the executrix' bank account. This sum was distributed in the form of a check by the executrix to herself as principal beneficiary upon the closing of the bank account. She immediately deposited that check to Eunice Merkle Spec. Tr. in the same Grant County Bank. Her individual endorsements on two other executrix' checks, the executrix fee check and the reimbursement check, were also endorsed Eunice Merkle, Trustee.

The sum of $2863.66 withdrawn by her during the course of administration was to reimburse herself for the amount she had paid her Baker attorneys for legal fees and costs in defending herself in the will contest brought by the decedent's surviving brother. There was a 6¢ discrepancy. It is easily explained. Mrs. Merkle's executrix check in the amount of $2863.66, drawn on the 23rd of June, 1961, for the purpose of the reimbursement, was reported in the final account inadvertently as $2863.60. She had settled with the decedent's brother on May 30, 1961, by paying him $8475.00 out of her personal funds.

This same $2863.60, together with an additional $1187.73 paid to her Grant County attorneys, Yokom & Campbell, for the probate and legal expenses, constituted the $4051.39 listed as attorneys' fees in Schedule A of the inheritance tax report of the State Treasurer, and was allowed apparently as one of the deductions in computing the net taxable estate amount upon which the inheritance tax was paid. Plaintiffs, at the time of the first hearing before this court, discovered, upon reviewing the record, that the legal

expenses in the amount of $4051.39, taken as a deduction on the executrix' report to the State Treasurer for the purpose of computing the net taxable estate, included the amount of $2113.60 which taxpayers listed as a deduction on their 1961 joint income tax return.

The difference between the sum of $2113.60 claimed as a deduction by the taxpayers on their 1961 joint income tax return and the amount of $2863.66 shown on the check (No. 12 in the voucher file and marked "Fees") presumably was the amount of out-of-pocket expenses and court costs incurred by the Baker law firm in defending the taxpayer, Eunice Merkle, in the will contest.

The 1961 income tax return shows taxpayers' claim of capital losses in the amount of $9977.63 computed by them on page 2 of their return (Exhibit No. 8) as follows:

"HAROLD and EUNICE MERKLE—1961
John Day, Oregon
Will Contest 1961 Estate of Kurt Hirsch, Deceased (Circuit Court, Grant Co., Oregon)
Mrs. Eunice Merkle was execututrix and primary beneficiary in above estate. In order to preserve assets, following expense paid by her.

| | |
|---|---|
| Settlement of will contest | $ 8,475.00 |
| Legal expense | $ 2,113.60 |
| | $10,588.60 |

Total appraised value of inheritance:—35,057.61

| Personal Property | | |
|---|---|---|
| Cash | 17,778.81 | |
| Chattel mtgs. | 3,442.01 | |
| Notes | 504.77 | |
| Real mtges. | 11,312.02 | 33,037.61 |
| Real Property | | |
| Seneca, Ore. | 2,020.00 | 2,020.00 |
| Total | | 35,057.61 |

Will contest expense treated as follows:

(1) Real Property    2,020.00
    (a) % of total estate 5.73%
    (b) Capital expenditure 5.73%
        times 10,588.60 equals         711.00
    (c) Appraised value         2,020.00

    (d) New cost basis         2,731.00
        (State and Federal)
    Reported Schedule B

(2) Cash:—17,778.81
    (a) % of total estate 50.71
    (b) Pro-rated expense
        50.71% times 10,588.60 equals 5,369.47
    (c) Loss 5,369.47
    (d) Reported Line 7, pgs. 1-1040 (Federal)

(3) Mortgages and notes 15,258.80
    (a) % of total estate equals 43.52
    (b) Pro-rated expense
        43.52 times 10,588.60 equals 4,608.18
    (c) Treated as capital loss
        Reported Schedule D-C $1,000 per year
           (Federal)
        State—Loss $4,608.16."

That return shows gross income to taxpayers of $22,243.10. From this amount, taxpayers deducted losses in the amount of $10,177.97 (the $9977.63 charged to cash, notes and mortgages, and the sum of $200.34 which is not in dispute here), leaving a figure of $12,065.13 as total income on the line so designated on their Oregon return.

If the court holds that the portion of the amount of $8475.00 (settlement payment only) relating to cash, notes and mortgages, is deductible in any manner and under any circumstance as a capital asset loss under ORS 316.320(1) (b) for the purpose of computing the

1961 net income, the percentage allocations to be applied as proposed by the taxpayers would be as follows:

"(a) 5.73% of the $8475.00 to be added to the unadjusted basis of the inherited real property (appraised at the time of the decedent's death in the amount of $2020.00);

(b) 50.71% of the $8475.00. This percentage figure represents the ratio of decedent's cash on hand at time of death (being the amount of money in the decedent's checking account and the $3.00 in his billfold) to the total amount of the appraised values of the assets, and the amount representing the product of 50.71% of the $8475.00 would be used to reduce the value of cash received by the taxpayer at the time of the distribution of the estate; and

(c) 43.52% of the $8475.00 to be added to the unadjusted basis of the notes received by her upon distribution (the appraised value of the notes at time of decedent's death was $15,258.80). To determine the value of the notes received by her at the time of distribution, it would be necessary to deduct from that amount the value of the notes paid off during the course of the administration.

The proposed percentages relating to cash, notes and mortgages total 94.23%.

Taxpayers, in their brief, contend that 94.23% of the settlement payment constitutes a capital loss incurred in connection with the liquidation of inherited property acquired from the estate, and may be fully deducted on their 1961 joint return as losses incurred in transactions entered into for profit, though not connected with the trade or business. Taxpayers consider the payment a liquidation of the inherited property in the year of acquisition. Taxpayers contend that the assets received by inheritance in this case qualify as capital assets within the meaning of ORS 316.320(1)(b). Taxpayers also contend that the proportionate

part of the settlement payment is a capital expenditure to be added to the cost basis for the purpose of ascertaining capital gains or losses, inasmuch as taxpayer Merkle paid the $8475.00 to protect her right to receive the same, and that such addition to the basis constituted her then adjusted basis and determined in 1961 whether there had been a gain or loss.

The state concedes that the values of the assets established by the appraisers became the unadjusted basis of these assets, but the state, in rejecting the contentions of the taxpayers, claims that the settlement payment under no circumstance can be used as a loss deduction on their 1961 joint income tax return for the purpose of computing net income.

In considering the deductibility of the claimed losses under ORS 316.320(1) (b), the court must determine whether or not any part of taxpayer Merkle's claimed losses upon the 1961 joint income tax return resulted from and upon the taxpayer's sale or other disposition of any of the estate assets within the period between taxpayer's receipt thereof on August 7, 1961, and the close of calendar year 1961, and whether or not any of such assets producing loss, if any, qualified as ORS 316.320(1) (b) capital assets for taxpayer at time of such sale or other disposition, and, also, whether or not the settlement payment, or any part thereof, can be added as a capital expenditure to adjust the basis of any of such assets for the purpose of computing loss, if any, under the capital gain and loss provisions.

The initial questions and the holdings of the court in answering the same are as follows:

(1) Did the taxpayer sell or otherwise dispose of any of the assets that taxpayer received from the estate, upon distribution, at any time dur-

ing the period between the receipt thereof and the close of calendar year 1961?

Taxpayer received full payment on certain of the bequeathed notes described in the statement of facts. She deposited the executrix' check in the amount of $10,906.23, representing the cash balance distributed to her from the estate, in a checking account on the day she received it.

(2) Do deposit and payment of a check constitute "other disposition" within the meaning of the capital gain and loss provisions?

The court answers affirmatively, but that does not resolve the question of whether or not the check is a subsection (b) ORS 316.320(1) asset.

(3) Is payment of a note "other disposition" within the meaning of the capital gain and loss provisions?

That this question should be answered affirmatively is indicated by *Commissioner v. Olmsted,* 304 F 2d 16, 18, 19 (8th Cir 1962); *Carroll Furniture Co. v. Commissioner,* 197 F2d 718, 719 (5th Cir 1952); *Herbert's Estate v. Commissioner,* 139 F 2d 756, 758 (3rd Cir 1952), cert. denied, 64 S. Ct. 1263; *Buelterman v. United States,* 155 F 2d 597 (8th Cir 1946); *Long v. Commissioner,* 96 F 2d 270 (9th Cir 1938), cert. denied 305 US 616, 59 S. Ct. 74, 83 L. Ed. 392 (1938); *Ayer v. Blair,* 58 App. D.C. 175, 26 F 2d 547 (1928).

The court now turns to the first of the two difficult questions in this case.

(4) If assets, received from an estate, were disposed of by taxpayer during the period between the receipt of the assets and the end of calendar year 1961, did any of such assets qualify as ORS 316.320(1) (b) assets at the time of the

sale or other disposition thereof by the taxpayer?

ORS 316.320(1) (a), (b) and (c) and (2) provide as follows:

"(1) In computing net income there shall be allowed as deductions, losses sustained during the tax year and not compensated for by insurance or otherwise:

(a) If incurred in trade or business.

(b) If incurred in any transaction entered into for profit, though not connected with the trade or business.

(c) Of property not connected with the trade or business, if arising from fire, storm, shipwreck or other casualty, or from theft.

(2) The basis for determining the amount of deduction for losses sustained under paragraphs (a), (b) and (c) of subsection (1) of this section shall be computed according to the method prescribed for arriving at the adjusted basis in ORS 316.260 to 316.270."

Construction of the words "if incurred in any transaction entered into for profit, though not connected with the trade or business" found in subsection (b) of ORS 316.320(1) is the key to answering that question.

■ This subsection (b) describes capital assets owned and held as an investment by a taxpayer for the purpose of making a profit. Two vital elements must exist in the relationship of taxpayer to his capital asset to authorize, under this subsection, deductions, in computing net income, for losses resulting from and upon capital asset sale or other disposition. These elements are (1) existence of a transaction subjecting the capital asset to the risks of investment, and (2) profit motive in entering the transaction.

The transaction element can be one of two forms: (1) Taxpayer's commitment of capital assets whereby the assets are subjected to the risks of investment, involving transfer of the title to or possession of the asset to another, or (2) dedication of capital asset in risk-taking ventures in the nature of an investment, not for the personal use of the taxpayer, and not requiring the transfer of title or possession to another.

A transaction may occur without necessarily requiring the taxpayer to enter into some relationship with another. It does not necessarily require transfer of title to or possession of some capital asset. If it did, investors owning assets on a speculative basis for future gain, not income, would never, generally speaking, be able to avail themselves of loss benefits provided by subsection (b) in the case of investments involving the second form of transaction. The words "if incurred in transactions" can be satisfied by creating or establishing, or bringing about a relationship between taxpayer and asset which subjects the asset to the risks of investment. The word "transact" has several meanings in our language, among which are the words "to carry through, to bring about, especially, to carry on, or conduct, as business". What taxpayer must do is to bring about a relationship between taxpayer and his capital asset which subjects that asset to the risks of investment. An investment transaction can exist with or without a profit motive.

■ Common examples of the first form of "transaction" are purchases of stocks, bonds, debentures and leasing of rental properties, buildings, land, vehicles and other equipment, and lending of money and depositing of money. Most of the described examples are transactions entered into for profit. If the transaction element whereby property is subjected to the

risks inherent in investment is entered into without a profit motive, the asset in that investment transaction would not qualify as a capital asset within the scope of Subsec. ORS 316.320(1) (b).

■ Entering into this first form of transaction necessarily subjects taxpayer's assets to risks inherent in the use of the asset by another. Whether such risks lie within the scope of risks inherent in investment, as that concept is ordinarily understood in the business and financial world, is a question of fact to be determined from the circumstances and conditions surrounding the transaction.

■ The "transaction element" involving transfer of title or possession is easily identifiable in cases of capital assets held and owned as an investment by taxpayer for profit. The common forms of such assets are notes, bonds, debentures, stocks, mortgages, time deposits bearing interest, and rental properties. Proof of the transaction element and, incidentally, of the profit motive for entering into the transaction, generally involve no serious problems for the taxpayer. The very nature, and mode of acquisition, of notes, bonds, debentures, stocks, mortgages and rental properties in transactions, involving transfer of title or possession to another, make it relatively simple for taxpayer to establish both elements, "transaction" and "profit motive." Receipt of income and the possibilities of appreciation in value of the assets indicate the existence of the profit motive. Whether or not this first form of transaction is entered into for profit depends upon all the circumstances, conditions and terms of the transaction, and the relationship of the parties to the asset and to each other.

Examples, fewer in number and more difficult to prove, of the second form of transaction, can be found

in conversion of residential property into investment property, the conversion of a privately-enjoyed art collection to investment purposes, and any other conversion of property, real or personal, from a personal-use status into investment. Conversion of personal-use assets to an investment status obviously can be in either of the two forms of "transaction," and, depending upon the form of transaction taken, may involve either gain and income seeking, or both, in the first form of "transaction," or merely gain-seeking in the second form. As to any acquired asset, thereafter the investment-for-profit transaction, involving transfer of either title or possession, can be entered into for income or gain, or both, whereas the investment-for-profit transaction involving holding of the asset and not involving transfer of title and possession, is by its nature entered into for gain and characterizes speculative ventures. Such conversion or change of use of the capital assets must subject such assets to the risk inherent in investment. Taxpayer's overt acts and behaviour must generally be carefully scrutinized to determine the existence of the newly-established and alleged holding, handling, management and control of the asset for investment purposes, particularly if a subsection (b) of ORS 316.320(1) loss is eventually claimed by a taxpayer on a return for the purpose of a deduction in computing net income. There must be a clear pattern, rejecting the "personal-use" attitude. The self-serving declarations of a taxpayer may not be sufficient to establish this change of status. The claim of the existence of the profit motive in a transaction, involving no transfer of title or possession to another, is difficult to evaluate in the case of taxpayer's conversion of his asset from personal use to investment for profit. Upon sale or other disposition

in the case of this second form of transaction, if the risks materialize during the holding of the asset and if there is a resulting depreciation in value reflected in sales proceeds, less in amount than the adjusted basis, claiming a loss for the purpose of the subsection (b) deduction hardly aids the taxpayer's proof that he entered into this type of investment transaction for the purpose of making a profit.

One must distinguish this type of situation of conversion of use from the cases of speculative investment in diamonds, art objects and lands in an area of probable development, purchased initially as an investment for profit and thereafter controlled and held as such without any use thereof for personal satisfaction and enjoyment of the taxpayer. These assets, if held in this second form of transaction, generally produce no ordinary income and the anticipated profit, if any, is realized in the form of gain resulting from and upon sale.

The second statutory element, "for profit," requires that the transaction, in either of its two forms, of investing capital, be entered into by the taxpayer for the purpose of making a profit. The word "profit" has been defined as "the advantage or gain resulting from the investment of capital, or acquisition of money beyond the amount expended; a pecuniary gain."

The transactions entered into for profit suggest taxpayer's motive is the expectation of receiving (a) gain to be realized upon the sale or other disposition of invested capital and resulting from the anticipated appreciation of the capital asset's value during the period of the holding; or (b) income in the form of interest, dividends, rents and similar items, as payment to taxpayer for use of the invested capital; or (c)

308

both gain and income, depending upon the nature of the investment.

Implicit in subsection ORS 316.320(1) (b) is legislative encouragement to taxpayers to subject capital assets to risks inherent in investment. Should the risks materialize, the legislature permits the investor to deduct, in computing net income, losses upon the sale or other disposition of invested capital if the investment transaction was entered into for the purpose of making a profit. Detailing the risks incident to capital investment is unnecessary for disposal of this case. Such risks are certainly well known to all familiar with business investments. Explicit legislative authorization of deductions for losses incurred in transactions entered into for profit, not connected with the trade or business, necessarily suggests legislative intention to include within the statute only those capital assets which taxpayer, for the purpose of making a profit, by some act subjects to the risks of investment. There are no deductions, however, for taxpayer's losses incurred upon the sale or other disposition of invested capital assets if the transaction was not entered into for profit, regardless of the risks that may be incident to the investment of the asset. Committing surplus capital to the development of the economy is a legislative objective.

■■ Losses upon the sale of an asset held for personal use, such as a car, jewelry, residence and other similar items, never qualify for loss deductions under subsection (b). Gains, however, from the sale of such personal assets are always includable in gross income within the dragnet provision, ORS 316.105(1), unless there is a subsequent disposal of the proceeds of such sale in such manner that permits the taxpayer to avail himself of the provisions for non-recognition of gain

within the scope of some provision, such as ORS 316.281(6).

A beneficiary's sale or other disposition of inherited assets, lacking both the "transaction" and "profit motive" elements in the hands of the decedent at time of death, poses tax problems for a taxpayer-beneficiary intent upon immediate sale or other disposition of such assets and desiring to use any recognizable capital asset loss as a deduction under subsection (b). The mere act of inheriting under a will is no transaction entered into for profit. Upon receipt of the property, the beneficiary must bring about an investment relationship between taxpayer and asset. Such transaction, subjecting the asset to the risks of investment, must be entered into for the purpose of making a profit. Obviously, there can be no personal-use of such asset.

While distribution of the asset might be considered a transaction, so far as the executrix is concerned, it avails nought to prove the transaction element for the beneficiary. Overt acts and other ascertainable conduct on the part of the beneficiary establishing the "transaction entered into for a profit" must be proven so a court can conclude that it is more probable than not that such relationship exists for some reasonable length of time prior to and at the time of any sale or other disposition of the asset by the taxpayer, if the taxpayer is to succeed in claiming any loss resulting from the sale or other disposition as a subsection (b) deduction. In a nutshell, there must be sufficient evidence of the probable existence of an investment relationship for profit between taxpayer and the asset at the time of sale or other disposition.

What is needed to establish the probable existence of the "investment-for-profit" status of the asset will

depend upon all the circumstances involving the taxpayer and the asset. Factors, conditions, terms and considerations relevant to prove the existence of the two elements required by subsection (b) will undoubtedly vary from case to case and must be determined on an *ad hoc* basis.

In the instant case, decedent Hirsch lent money to various people upon notes described in the inventory. Decedent derived interest income from such loans. The lending of money established the transaction element whereby the decedent subjected his money to the risks of investment. The lending and the interest payment requirement marked the notes as "transactions entered into for profit." The record supports this conclusion.

Although the investment profit status of these notes at time of decedent's death does not determine the existence of a similar status at the time of taxpayer's disposition, by payment thereof to beneficiary in 1961, between beneficiary's receipt thereof and the close of the calendar year 1961, the very nature of the assets and the disputable presumption that the investment for profit status continues and passes from decedent to taxpayer justifies the conclusion that taxpayer held such notes as investments for profit at the time of payment to beneficiary in 1961, described in the stipulated facts. The act of inheritance generally is a neutral factor, providing no relevancy to the issue of the qualification of the assets as investments for profit at the time of subsequent sale or other disposition by a beneficiary. The act of inheritance neither adds to nor subtracts from the nature of the asset. However, it is said that the intention of the decedent may be presumed to carry over into the hands of the beneficiary. The effect and weight to be attached to such presumption

will depend upon the nature of the assets and the acts and conduct of the taxpayer-beneficiary after receipt of the capital asset. The presumption may be more easily dissipated in some cases than in others. This presumption, considered with all the other evidence, leads this court to hold that the notes which were paid off to the beneficiary in 1961 after her receipt thereof qualified as subsection (b) 316.320(1) assets at the time of payment.

Qualification of cash as an "investment for profit" capital asset under subsection (b) of ORS 316.320(1) at the time of beneficiary's disposition thereof demands analytical technique sharpening and adherence to the capital asset attribute requirements and policy of subsection (b). Decedent at time of death had on deposit in a checking account, apparently non-interest bearing, the sum of $17,778.81. The fact that his checking account was utilized in connection with his lending business does not establish the transaction element which requires commitment of capital assets to the usual risks of investment, unless we can say that, in these years following the depression years and bank failures of the 1930s, the risk of depositing money is an investment risk within the contemplation of subsection (b). At most, it was a weak transaction element. The only risk would be bank failure, or possibly the occurrence of some casualty for which a loss deduction is provided in ORS 316.320(1) (c). But, even assuming the transaction element, the transaction of decedent's depositing money in a checking account not bearing interest, was not entered into for the purpose of making a profit as that term is commonly understood. There is no basis to assume that the account bore interest. Nor can we assume that the account was not utilized occasionally for the payment of decedent's

personal needs, in view of the inventory recital of $3.00 in his billfold as the only other available cash asset at the time of his death. Keeping surplus money on deposit in a checking account is for convenience of taxpayer and reduces the hazards of keeping cash in a billfold or in the home. Depositing money in a non-interest-bearing checking account is no more significant in qualifying that asset for inclusion within subsection (b) than is the act of keeping cash in a safety deposit bank box, in a desk drawer at home, or in a billfold. The asset is neither being subjected to the usual investment risks, nor is it being held in a transaction entered into for the making of a profit.

The acts of the executrix during the administration do not aid the taxpayer in this case in proving the investment-for-profit status of the check at the time of its deposit. Amounts paid on notes maturing during the course of the administration were deposited in the estate checking account by taxpayer in her role as executrix. Probably the will contest and administration considerations made it impractical, if not impossible, for the estate to make loans from the estate funds. After the payment of claims, including reimbursement by executrix to herself as an individual in the amount of $2863.60 for the legal fees and costs incurred by herself as an individual in defending herself in the will contest, inheritance taxes, executor's fees, attorneys' fees for the probate services, and other administration costs, taxpayer distributed the remaining assets to herself as an individual. Pursuant to the final order of August 7, 1961, approving final account, assets *received* by herself included the notes, not previously paid during administration, some real property located in Seneca, Oregon, not involved in this tax court appeal, and cash in the amount of

$10,890.63. Taxpayer immediately deposited her executrix' check for that amount, according to the taxpayer's individual endorsement on the check in the probate voucher file, on August 9, 1961, to the account of Eunice Merkle, Spec. Tr., in the same Grant County bank where previously taxpayer had maintained her executrix' account for the estate. Reduction in value of cash on hand at time of decedent's death obviously and inevitably occurred as a necessary consequence of the administration of the estate. After all, she inherited the decedent's assets subject to the course of administration. To qualify this check as a subsection (b) asset, taxpayer must prove that the executrix' check, after receipt by taxpayer as an individual, was held and handled by her individually as an investment in a transaction entered into for profit at the time of its disposition.

There isn't an iota of evidence to support the taxpayer's profit motive, and the only transaction to which she subjected the credit or funds represented by the check was the risk of keeping the money in a checking account, presumably non-interest-bearing, in the Grant County bank. This risk is hardly the type that represents investment risks in the business sense at this particular time. The non-profit motive of decedent in relation to the money in the decedent's bank account is disputably presumed to continue and pass to the taxpayer, unless taxpayer promptly manifests a change to a commercial attitude by committing the asset to investment involving the risks incident to investment *for the purpose of making a profit.*

*Waterman's Estate v. Commissioner,* 195 F 2d 244, 246, 247 (2d Cir 1952), focuses one's attention upon what the taxpayer does with an inherited asset after receipt thereof. Taxpayer's depositing of the money

in a checking account for the purpose of safekeeping of the fund and for personal convenience of taxpayer minimizes the risks of ownership, but that does not prove the profit motive. Neither gain nor income can be realized from an ordinary non-interest-bearing checking account. Nor was taxpayer's payment of $8475.00 to the will contestant to settle the case relevant to prove the existence of the investment-for-profit status that must characterize the check, representing the cash received upon distribution, at time of deposit thereof in 1961 by taxpayer.

The burden of proof upon taxpayer is measured in terms of probability, not speculation. We are not to speculate from the evidence in this case as to taxpayer's intention to make profit and as to the existence of an investment status of the asset at the time of disposition of the asset. We are also not to speculate on whether or not she invested the money soon thereafter by purchasing stock, lending money, depositing it in a time deposit interest-bearing account, purchasing rental properties or engaging in any other form of investment-for-profit transaction. And even that might not be sufficient to establish that the asset, cash, received in the form of a check, possessed the two subsection (b) ORS 316.320(1) elements at the time of disposition of the check. Additionally, subsection (b) presupposes an asset which by its very nature decreases or rises in value under the influence of varying market, business and investment conditions. The U.S. dollar in its present paper form keeps its inherent value as the currency of the nation, although its purchasing power rises and declines as a consequence of business and financial activities. This is not true of assets, like land, stocks, bonds, mortgages, and even in certain instances, interest-bearing time deposits. Their

very nature can be affected by the investment, that is to say, that the conditions and forces constituting the risk to which the asset is subjected may change the actual usefulness and inherent value of the asset.

This court would qualify taxpayer's statement in the briefs that, even if the decedent did not acquire the asset for profit (or did not hold the asset as an investment-for-profit asset), as, for instance, a private residence which decedent occupied, the transaction may still be one for profit if the heir or devisee endeavors to dispose of the asset as quickly as possible after it reaches his hands. What the taxpayer must do and how long such action must be taken to dissipate the previous "personal-use" character of an asset depend upon the nature of the asset and upon all the circumstances of taxpayer's relationship to the asset between the time of inheritance and the subsequent taxpayer's sale or other disposition. Does taxpayer refrain from using the asset for personal satisfaction, comfort and pleasure? How does taxpayer manage, control and handle the asset? Disposing of the asset as quickly as possible after it reaches hands of taxpayer may or may not necessarily help taxpayer in proving the existence of the investment-for-profit status of an asset at time of sale or other disposition. Disposing of an asset, such as a house, or even stocks or bonds, quickly after it reaches the hands of taxpayer-beneficiary, might indicate no more than the taxpayer's need of ready cash for personal use. Quickly depositing a check, as was done in this case, for the purpose of putting the remaining cash balance distributed to beneficiary into taxpayer's individual account, marked Spec. Tr., in the absence of any other proof, hardly proves the investment-for-profit status of the check at the time of its deposit.

If taxpayer manifests by overt act and conduct the establishment of an investment relationship (transaction involving subjecting the asset to the risks of investment), and if such a statutory transaction, after receipt of the asset, was entered into by taxpayer for profit (not solely to take a loss under subsection (b)), and if taxpayer proves the probability that such elements existed prior to and at the time of the sale or other disposition of such asset, by credible evidence in the record, then we agree with taxpayer's statement.

Whatever may have been the nature and use of the asset in the hands of taxpayer's predecessor, and whatever may have been the method of taxpayer's acquisition, whether by inheritance, gift, purchase, foreclosure or otherwise, the question of determining its investment-for-profit status at time of subsequent sale or other disposition hinges upon finding out what the taxpayer, after acquisition, does with the property. The nature of the asset, the handling and control of the asset by taxpayer following acquisition, the possible uses of the asset, the needs, and the financial condition of the taxpayer; and the relationship of the asset to taxpayer's needs and financial conditions, may provide evidence relevant to the existence of investment-for-profit status of the asset at time of disposition. No hard and fast rules can or should be laid down to indicate the scope of relevant evidence and the factors to be considered. It must be developed case by case.

Admittedly, there is no statutory provision allowing the taxpayer to deduct the settlement payment, as such, as a loss deduction in computing net income for 1961. What taxpayer Merkle seeks to do, in effect, is to take a full loss deduction in the year 1961 for that proportionate share of settlement payment relating to

cash on hand at decedent's death, without qualifying the asset which she received and which she disposed of under ORS 316.320(1) (b). Taxpayer seeks to avoid the interrelationship between the gain and loss provisions and ORS 316.320(1) (b), requiring that, before any loss can be deducted upon sale or other disposition of a capital asset, not connected with the business or trade, the asset must have been committed and held by taxpayer in an investment transaction entered into for the purpose of making a profit, both prior to and at the time of such sale or other disposition.

To stretch ORS 316.320(1) (b) to include a disposition of a check by depositing the check, representing the cash, in a bank, under the circumstances of this case, is to ignore the implicit legislative policy and the statutory requirements of ORS 316.320(1) (b).

■ However harsh it may seem to the taxpayer, the Oregon statute allows "deductions" for losses sustained during a year upon sale or other disposition of assets possessing the characteristics resulting from commitment of capital asset to investments entered into for profit and none for losses relating to uncommitted capital and to investments not made for profit.

As Justice WARNER put it in *Keyes v. Chambers et al*, 209 Or 640, 662, 307 P2d 498 (1957), an unpleasant result to the taxpayer does not justify "a judicial amendment in order to avoid what such taxpayers believe to be economically unwise or inequitable results." The court said in *Keyes v. Chambers et al*, *supra*, pgs. 645-646:

> "* * * Statutes relating to deductions allowable in computing income must be strictly construed against the taxpayer and in favor of the taxing authority."

And also at p. 646:

"* * * that such credits, deductions or exemptions as the Legislature may allow in the computation of an income tax are privileges accorded as a matter of legislative grace, and not as a matter of taxpayer's right."

■ The simple rule is that tax deduction provisions are to be strictly construed in favor of the tax authorities, and their operation is never to be extended by construction which ignores the language and the legislative policy embodied in the statute. The Tax Court finds this judicial guidance in Justice WARNER's opinion for the Oregon Supreme Court in *Keyes v. Chambers et al, supra,* at p. 662:

"The province of the courts is to declare what the Legislature has done, not what it should have done * * *."

The Oregon Supreme Court has held in a multitude of cases:

"The only duty of the Court is to ascertain the legislative intent from the language of the law, and, when ascertained, to give it effect."

Plaintiffs asked the court to consider the dissenting opinion in *Waterman's Estate v. Commssioner,* 195 F 2d 244, 246-247 (2d Cir 1952). The decision of the majority reversed the Tax Court, in which the Tax Court held that no loss deduction was allowable because it had not been shown that the decedent acquired the note either in a business transaction or in one entered into for profit, and remanded the case to the Tax Court for an allowance of a loss claimed. The taxpayer, in *Waterman's Estate,* was the executor making a claim for loss upon the disposition of a bill of exchange, of which the executor, during the course of administration, secured the payment. The obligation

was paid by depositing 10,000 pounds to the credit of the taxpayer-executor in a London bank, where it was held throughout 1945 because of currency restrictions of the British government, in a blocked sterling account. Petitioner filed a fiduciary income tax return for the estate in 1945, in which no loss deduction was claimed on the collection of the bill of exchange, but the Commissioner determined a deficiency in taxes on income as reported in that return, and, in the proceedings which followed the deductibility of a claim loss on the collection of the obligation was put in issue. The amount claimed was $6406.94, the difference between the value of the obligation in dollars at decedent's death and the value, in dollars, of the bill of exchange representing 10,000 convertible pounds at the date of payment. The majority allowed the loss deduction under the federal statute upon the ground that it was sustained by the taxpayer in a transaction in which he, as an executor, had entered into for profit. Judge Frank, in *Waterman's Estate, supra,* pgs. 245-247, dissented on the ground that the majority ignored or underemphasized the requirement that the taxpayer's motive or state of mind is crucial, and that a loss is not deductible if the taxpayer lacked the dominant profit motive when he undertook the transaction. It is clear that this was a non-interest-bearing bill of exchange. The pound, in terms of dollars, depreciated between the time of purchase by the decedent and the disposal thereof by the taxpayer in his fiduciary capacity as executor.

Nothing said or done by the majority, and nothing said by the dissenting judge, is any comfort to the taxpayer in the instant case when a careful analysis of that case is made. Accepting this court's definitions of concepts of "transaction" and "transaction entered

into for the making of a profit," it is obvious that a disposition of the asset by the executor in his fiduciary capacity, securing the payment of the bill of exchange in blocked currency, was a disposition of an asset which he could only hold for the purposes of investment, and which he held for the purpose of making a profit. No executor, obviously, could possibly use that asset for his personal use.

It is pointed out by Judge Frank that the taxpayer has the burden of proving that, at the time he entered into the transaction, his dominant motive was profit-making.

The following language of Judge Frank is quoted from *Waterman's Estate, supra,* pgs. 246-247.

"* * * A taxpayer who buys an object or loans money, at that time necessarily has an intention, one way or the other, *vis a vis* the making of profit. But if someone else buys the object or makes the loan, and the taxpayer acquires it from him by inheritance, the taxpayer cannot show that he actually had such a motive at the very moment he 'entered into the transaction'—the 'transaction' of inheriting the property. It is arguable, not unreasonably, however, that whatever the decedent's motive may have been, it should be deemed to continue and to pass to the taxpayer. So when the decedent had no profit motive—as where he bought for his own use a residence or a pleasure yacht—the Tax Court has held that the same motive is assumed to continue after his death and is therefore to be ascribed to the inheritor—*unless he promptly manifests a change* to a commercial attitude, as by trying at once to sell or rent the residence of the yacht. * *. * (Omission of citations) * * * In such cases, the Tax Court has warned that *'the fact that property is acquired by inheritance is, by itself, neutral.* The important inquiry is what the taxpayer thereafter does with the property.' Carnrick v. Commissioner,

supra, 9 T.C. at p. 760: '* * * *neither does [inheritance] in and of itself demonstrate a motive connected with gain or profit, as might, for example, the purchase of investment property.* * * * [I]f nothing more is shown than that property was acquired by inheritance, any loss must be disallowed.'* Marx, supra, 5 T.C. at p. 174."

The balance of the dissenting opinion in *Waterman's Estate* case is also relevant to the issues involved in this case:

"In such a case, according to the Tax Court, the inheritor is permitted to prove, if he can, a disjunction from, or discontinuity with, the decedent's non-commercial attitude. This discontinuity, the Tax Court allows the taxpayer to prove by showing that he immediately took steps significantly disclosing a shift to a new intention. Whether the Tax Court, in so deciding, correctly interpreted § 23 (e) (2) need not here be considered. But, assuming it did, the important fact in the case at bar, is that the taxpayer (the executor) took no significant steps at all to show any change of attitude. The decedent, who obtained the note in a non-profit mood, had held it with the obvious intention of collecting it. The executor, in continuing to hold the note for collection, did nothing new, nothing to suggest a departure from the attitude with which the decedent acquired and retained ownership of the note. It is no answer to say, as my colleagues do, that the executor had a 'duty' to collect. For, since the decedent had the same intent to collect, the executor's duty to collect does not supply any evidence of a break with the decedent's intent.

"In short, I disagree with my colleagues' conclusion that the original note-owner's death, without more, automatically converted the reason for holding the note for collection from one devoid of a profit motive to one in which that motive dominated. Mechanically to give such effect to the mere fact of death is to eliminate utterly the statutory

requirement that the taxpayer have a primary profit-making intention. Such elimination, I think, is not statutory interpretation, but statutory nullification." *Waterman's Estate* case, *supra,* p. 247.

Plaintiffs, in citing the dissenting opinion of Judge Frank in *Waterman's Estate, supra,* pgs. 246-247, correctly state that the important inquiry is what the taxpayer thereafter does with the property.

The decision and holdings of the majority in the *Waterman's* case and the dissenting opinion of Judge Frank in the *Waterman's* case clearly support the holding by this court in the instant case that the notes received by taxpayer Merkle, and disposed of by her between the date of receipt thereof in 1961, and the close of calendar year 1961, were a subsection (b) ORS 316.320(1) capital asset, and that the check received by her upon closing of the estate on the 7th of August, 1961, and deposited by her in her checking account on August 9, 1961, was not a subsection (b) asset.

Anyone desiring further to pursue the question of the definition of a "transaction entered into for profit" may find some helpful information in Vol. 5, Mertens, Law of Federal Income Taxation, Secs. 28.34-35, pgs. 129-146, inclusive, Revised Edition, and innumerable cases cited in the supporting footnotes.

The court shall now consider the question of whether or not any part of the settlement payment can be used for the purpose of adjusting basis of the inherited notes to compute loss, if any, upon payment of any of such notes within the period between the date of receipt thereof by taxpayer in 1961 and the close of calendar year 1961.

Initially, the court considers these questions and the the statutes which essentially determine the answers to the questions.

(5) When is loss sustained?

ORS 316.275(1) provides as follows:

> "(1) Upon the sale or exchange of property the entire amount of the gain or loss, as determined under ORS 316.260 to 316.270 shall be recognized, except as provided in this chapter."

■ Reading ORS 316.275(1) and ORS 316.320 together leads easily to the conclusion that the loss is sustained in the year of sale or other disposition when the transaction is closed.

(6) When is loss on the sale or other disposition of assets recognized?

That question is obviously answered by the above-mentioned ORS 316.275(1). None of the exceptions referred to in that section and as provided in the chapter relating to capital gains and losses is involved in this case.

(7) When is loss on the sale or other disposition of assets taken?

■ ORS 316.320 clearly provides that the loss on the sale or other disposition of assets is taken in the year in which such losses are sustained for the purpose of computing net income.

(8) How is a loss computed?

ORS 316.260(1) and (2) provide as follows:

> "(1) The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in ORS 316.270, and the loss shall be the excess of the adjusted basis provided in ORS 316.270 over the amount realized.
>
> "(2) The amount realized from the sale or other disposition of property shall be the sum

of any money received plus the fair market value of the property (other than money) received."

(9) What statutory section governs the determination of the unadjusted basis to the taxpayer of any of the notes received from the estate and disposed of by the taxpayer-beneficiary during the period of time between the receipt of the notes and the close of calendar year 1961?

ORS 316.266(6) provides as follows:

"If the property was acquired by bequest, devise, descent or inheritance, or by the decedent's estate from the decedent, the basis shall be the same as if the property had been purchased for its fair market value at the date of the death of the decedent. * * *"

There is a similar State Tax Commission regulation governing this matter.

(10) What is the statutory section that governs the determination of the adjusted basis of notes so received by the taxpayer, and upon which she received payment between the date of receipt thereof and the close of the calendar year 1961?

ORS 316.270(1) and (2) (a) provide as follows:

"(1) The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under ORS 316.266, adjusted as provided in this section.

"(2) Proper adjustment in respect of the property shall in all cases be made:

"(a) For expenditures, receipts, losses or other items, properly chargeable to capital account, but no such adjustment shall be made in respect to items for which deductions have been taken by

the taxpayer on his tax returns for prior years made under this chapter or under the Property Tax Relief Act of 1929, as amended, if the adjustment of such return is barred."

The next question is the second major issue involved in this case.

(11) Is any part of the settlement payment an "expenditure" or "other item" properly chargeable to capital account of the inherited notes received by the taxpayer, and upon which she received payment in 1961, within the meaning of ORS 316.270(1) and (2) (a) for the purpose of determining and recognizing gain and loss under ORS 316.256 to and including ORS 316.297?

■ This court holds, upon the authority of *Klein v. Commissioner of Internal Revenue,* 84 F 2d 310 (7th Cir 1936), and *Allerton J. McEwan v. Commissioner,* CCH Dec. 21, 558 (M) T.C. Memo. 1956-57, filed January 31, 1956, that payments made by a taxpayer as the principal beneficiary under a will for the purpose of upholding and protecting the right of the beneficiary to inherit under the will are capital expenditures chargeable to the capital account of the assets received under the will. See also I.T. 1689, C.B. II - 1, p. 122, suggesting similarity to an action to perfect title and therefore holding the cost to be a capital expenditure. Other cases supporting this holding are discussed hereinafter.

The ruling in the *Klein* case was approved of in *Olive B. Hays v. Commissioner,* 11 T.C. Memo. 461, Dec. 18, 959 (M) (1952).

In *T. F. Moody,* 209 F Supp. 74, (D.C.) 62-2, U.S.T.C. ¶ 9840 (1962), it was held that attorneys',

accountants' and handwriting experts' fees incurred in the defense of a will were costs of defending and perfecting title to property, and were capital expenditures, not expenses for the preservation of income-producing property. Other cases supporting this conclusion are *Vernor,* 87 Ct. Cls. 435, 23 F Supp. 532, 38-2 U.S.T.C. ¶ 9339 (1938); *L. G. Mason,* 21 T.C. M. 557, Dec. 25, 474 (M), T.C. Memo. 1962-100.

The point is that expenses incurred in settling a proposed attack upon the validity of a will under which taxpayer acquires properties should be charged to the capital account of such assets for the purposes of the determination of gain or loss upon the subsequent sale or disposition of such assets.

In circumstances of this case, principal beneficiary's act in settling a will contestant's claim against the right of beneficiary to inherit under the will is not inherently wrong. No judicial denial of capitalization of a settlement payment in the circumstances of this case could be justified upon some public policy ground arising out of the act of the settlement. The taxpayer in her answer in the contested will case denied contestant's charge that taxpayer used fraud and undue influence and the other misconduct upon the decedent. There is a presumption of innocence and of absence of wrong-doing. That presumption, whether considered evidence or merely a cautionary direction to triers of fact to refrain from the human impulse to be suspicious when a charge of wrong-doing is made, causes this court, in considering the taxpayer's act of making the settlement, to find no basis to invoke some public policy ground to reject the claim of taxpayer to capitalize the expenditures. The payment under the circumstances of this case is no admission of any wrong on the part of taxpayer.

ORS 316.270(2) (a), in providing that "proper adjustment in respect of the basis of property shall in all cases be made for expenditures, receipts, losses or other items properly chargeable to capital account," is a general test describing no particular items. This statutory section neither includes nor excludes settlement payments. The criterion is embodied in the general concept "properly chargeable to capital account," suggesting resort to reasonable accounting theories and practices in business transactions as a guide to determining whether or not a settlement payment should be capitalized under the circumstances of this case. While this court did not have the benefit of accounting expertise in the evidence, accounting theories and practices in standard textbooks suggest that costs and expenses of defending and protecting title and settlement payments to extinguish adverse claims are capital expenditures. To except a settlement payment from this general rule in the absence of both statutory exclusion is ORS 316.270(2) (a) and any ground of public policy based upon proven misbehaviour or illegal conduct in the act of settlement itself, under the circumstances of this case, cannot be justified.

Charging the expenditures to capital accounts of assets admittedly delays the possible realization of tax benefit from such expenditures under the existing provisions governing determination and recognition of gain and loss. Such procedure requiring taxpayer to risk legislative amendment, the fluctuations of the market and the conditions of the investment at the time of sale or other disposition of the asset, is simply the necessary result of the legislative enactment.

The State Tax Commission, in its order in this case, recites that it "is aware that it is well settled that the

expenditures of this nature, and particularly the legal fees paid, are considered as capital expenditures; but this does not mean that a beneficiary is automatically entitled to a loss deduction. To the contrary, losses are allowed only where authorized by law, and the principal authority under Oregon Law, ORS 316.320, make (sic) it apparent that the taxpayer is not entitled to claim the loss under any of the provisions of this statute."

This court concludes that some of the courts, dealing with the problem and seemingly indicating that settlement payments and legal expenses are not deductible, have had before them taxpayers who, in effect, were attempting to treat settlement payments and legal expenses as ordinary business losses, by deducting the full amount either in the year when they were incurred or when the estate assets were distributed. The taxpayers in most cases have been unwilling, apparently, to capitalize such expenditures by charging them to the capital accounts of the assets received and thereafter using capital gains and loss provisions to compute losses resulting from and upon the sale or other disposition of assets received from an estate. The facts in some cases undoubtedly have caused the courts, in rejecting the taking of such expenses as ordinary losses, to express opinions that might cause one to believe that under no circumstance can those expenses be capitalized for the purpose of computing losses under the capital gains and loss provisions of the law. If the taxpayers had proceeded to capitalize those expenses as was suggested in the *Klein* case, *supra,* an entirely different attitude and result probably would have appeared in the judicial writings regarding these matters.

Let's meet head-on both the ruling and the reasoning

in the case of *Merriman v. Commissioner*, 55 F 2d 879 (1st Cir 1932). This court agrees with the holding. The explanation for the holding in that case, properly analyzed, does not preclude the capitalization of the settlement payment in this case. The facts in that case are clearly distinguishable from the facts in our case. Here are the facts in the *Merriman* case, *supra*, p. 880, quoted from the Opinion:

"* * * During the taxable year 1926, the petitioner paid an attorney's bill and legal expenses incurred in 1923, in an unsuccessful effort to break the will of her aunt. The will was sustained by a decree of the Surrogate Court for New York county, N. Y., May 31, 1923. In re Bourne's Will, 121 Misc. Rep. 12, 199 N.Y.S. 904. No proceedings were thereafter taken further to contest the will, and the aunt's estate was settled in accordance therewith. The petitioner brought the suit with the hope that she would recover something out of the estate if she were successful in breaking the will.

"The expenditure of $2,028.45, paid by the petitioner in 1926, was taken as a deduction by her in her income tax return for that year as a loss on a 'transaction entered into for profit.' The Commissioner disallowed the deduction on the ground that it was a personal expense, and the Board of Tax Appeals affirmed the Commissioner's decision.

"The only error argued is that 'said board erred in holding that said legal expenses were not deductible as a loss incurred in a transaction entered into for profit.'"

In that case, the taxpayer was attempting to set aside the will. In our case, the taxpayer made her payment to protect her right to inherit under the will, and to receive the assets bequeathed and devised to her.

The taxpayer, in *Merriman, supra,* tried to take those expenses as though they were ordinary business

expenses, regardless of the fact that she was purportedly relying upon the following section of the Internal Revenue Act:

> "In computing net income, there shall be allowed as deductions * * * (5) losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with a trade or business."

The taxpayer Merriman was unsuccessful in her attack to set aside the will. She received no assets. There being no assets received, obviously there were no capital accounts to which the legal expenses could be charged. Obviously, loss does not refer to what one has never had. It is necessary to distinguish between the case of an individual defending his rights to receive the property bequeathed and devised to him and the case of a person making an unsuccessful attack upon the validity of a will and then trying to deduct the legal expenses of such unsuccessful attack. It is unnecessary in this case to speculate about the tax treatment in *Merriman* if taxpayer had been successful in her attack against the will.

The court, in *Merriman, supra,* at p. 880, went on to say:

> "When the petitioner brought her suit to break her aunt's will, it was to establish her right to what she must have claimed honestly belonged to her. To hold otherwise would be to impute to her dishonest motives. If the litigation had proved successful, she would have received only such part of the testator's estate as justly belonged to her. That would not have been a profit. The litigation was unsuccessful. Her anticipated share in the estate was denied her. It was not loss because she never possessed it. * * *"

But in the instant case, Mrs. Merkle was defending her interest, even though it was not indefeasible during the course of the administration, in the assets devised and bequeathed to her by the will. In making the settlement payment to end the will contest, she was doing no more than is usually done in settling an adverse claim against one's title to or possession of property. In the last-mentioned cases, those expenses generally are treated as expenditures to be charged to the capital account of the assets.

These analagous situations in which legal expenses and settlement costs are considered as capital expenditures and chargeable against capital accounts of the assets are discussed in Vol. 4, Mertens, Law of Federal Income Taxation, ch 25, § 25.24 (cost of protecting ownership), pgs. 90-98, § 25.25 (cost of real property) pgs. 98-101, and § 25.20 (capital expenditures) pgs. 72-82.

In Mrs. Merkle's case, from the moment of decedent's death she had sufficient rights and interests in the assets devised and bequeathed to her that it was not only reasonable, but necessary, for her to expend money for the protection of those rights against the will contestant's suit. If the contestant had been successful, she would have lost everything, because she was a non-relative of the decedent, whereas the contestant was his surviving brother.

The court in the *Merriman* case, in the next to the last sentence in the decision, stated:

"* * * To hold that the expenses of litigation under the existing facts were a deductible loss because incurred in a transaction entered into for profit would be straining the meaning of 'profit' beyond any ordinary or usual meaning of the word and beyond the sense in which it was used by Congress." *Merriman, supra,* p. 881.

This court agrees with the result in the *Merriman* case. The real point, however, is that a holding that expenses incurred in unsuccessful litigation under the circumstances of the *Merriman* case are not deductible for the purpose of computing net income, has no bearing upon the question of the right of the taxpayer in the instant case to charge the settlement payment to the capital accounts of the assets received under the will, or upon the question of ascertaining whether an asset received from an estate qualifies as a capital asset within the meaning of the code words "if incurred in any transaction entered into for profit, though not connected with the trade or business," at the time of the sale or other disposition of the asset by the taxpayer-beneficiary.

The opinion of Judge Hand in *Commissioner of Internal Revenue v. Field,* 42 F 2d 820 (2d Cir 1930), does not persuade this court that this court should deny Mrs. Merkle the right to charge a proportionate share of the settlement payment against the capital account of the notes. The State Tax Commission relies upon this case. Judge Hand, in holding that attorneys' fees paid out by a taxpayer in a suit involving determination of taxpayer's rights to deceased brother's estate, under grandfather's will, are not deductible as capital expenditures, stated in *Field, supra,* at p. 822:

"* * * To conduct the Illinois suit, Field retained attorneys upon an agreement that they should receive fifteen per cent of any income which through their efforts might be relieved of the provisions for accumulation, of the restraint upon alienation, and apparently also of the remainders over to issue. Eventually Field settled this claim by agreeing to pay $200,000 in 1922, the year in question here, and $100,000 annually for eight years more. The

payment of $200,000 Field deducted in his return, and the Commissioner disallowed the deduction. The Board reversed the Commissioner on the theory that the payment was a 'capital expenditure,' part of the cost of a wasting asset."

Field had his assets. He was the attacking force. It was a family situation.

The court, in the *Field* case, discusses a factual situation that differs radically from the one in the instant case.

Judge Hand continued in *Field, supra,* p. 822:

"This is tenable only in case we may treat the accelerated payments of income as profits, acquired at the cost of the fee. For the computation of profits upon purchases and sales, the statute prescribed no details, and it has at times been found necessary to add to the purchase price incidental amounts without which the property could not have been secured. But if the payments here at bar are treated as the income arising from bequeathed or devised property and the attorneys' fee an expense of protecting the rights so granted, it was not a cost of acquisition, or 'a capital expenditure' at all.   *   *   *"

In the instant case, the payment made by Mrs. Merkle to the surviving brother should necessarily be added to the purchase price, because without it she might not have secured that which was bequeathed and devised to her.

Judge Hand continues in *Field, supra,* at p. 823:

"While an argument may be made, not wholly unplausible, that the acceleration of payments and the power of immediate and unconditional disposition which the decree adjudged, were new rights, any such doctrine leads too far. All that happened was that Field and the trustees got into a dispute

about the meaning of the will; and Field succeeded in getting the court to take his view. We cannot for that reason say that. the court's action changed what had all along been his right; it did not create them; he had them already. \* \* \*"

In the instant case, the settlement amount was a cost to secure and gain for Mrs. Merkle that which she would not have obtained if the suit to set aside the will had been successful. This payment certainly eliminated the uncertainty of whether she would take the assets devised and bequeathed to her and terminated the controversy and resulted in the relinquishment of the only claims asserted against her right to receive the estate property. The cloud over her title was removed.

*Manufacturers Hanover Trust Co. v. U. S.,* 160 Ct. Cls. 582, 312 F 2d 785 (1963), endorsed the rule that expenditures incurred in defending or perfecting title must be capitalized, and that such rule has long been recognized and often applied. If the primary purpose in expending money for legal fees was the protection of title, then the expenditure is capital in nature and must be capitalized. Here, the legal expenses are no longer asserted as items to be capitalized. But the making of the settlement payment by the beneficiary should be given similar capitalization treatment in this case.

The case of *Vernor v. United States Court of Claims,* 87 Ct. Cl. 435, 23 Fed. Supp. 532 (1938), contains language supporting this court's conclusion that settlement payments should be capitalized. Quoting from p. 534:

"Plaintiff paid his attorney for services rendered in this suit the sum of $2,003.10 and entered this payment on his books as a business expense for the year 1932, the year in which it was paid.

It will be seen from the facts recited that the purchase of this property was a speculative venture and not connected with plaintiff's regular business or trade insofar as disclosed by the record. The payment of legal fees was to protect plaintiff from having to bear the whole burden of this venture. The decision of the court simply limited plaintiff's liability. It was an expenditure to protect capital assets. The Board of Tax Appeals has repeatedly held that 'fees paid for legal services, where the acquisition of capital assets or the litigation of matters pertaining to assets of a purely capital nature were involved, were capital expenditures and therefore not deductible as ordinary and necessary expenses.' * * * (Omitting citations) * * *"

In *Crowley v. Commissioner,* 89 F 2d 715 (6th Cir 1937), the rule is stated (page 718):

"Both the statute (section 214 (a) of the Revenue Act of 1926, and section 23, of the Revenue Act of 1928, supra), and the Treasury Regulations 69, art. 101, and 74, art. 121, in effect limit deductible expenses to the current operating expenses incurred in producing income. * * * (Omitting citations) * * * The decisions make a clear distinction between cases where amounts are paid out as a result of litigation or as a means of settling a dispute arising from an ordinary business transaction (Cf. Kornhauser v. United States, 276 U. S. 145, 48 S. Ct. 219, 72 L. Ed. 505), and where the payments are made in order to acquire property or gain control of a business * * * (Omitting citations) * * * Expenditures made for the latter purpose are not deductible as ordinary and necessary business expenses. * * * (Omitting citations) * * *. The payment of legal fees by plaintiff was for the purpose of determining the extent of his liability under the syndicate agreement and to protect his interest in the property. The syndicate interest was a venture outside of his regular business or trade

and the expense incurred was not an ordinary and necessary business expense but a capital expenditure. The decision of the Commissioner in refusing the deduction was correct. The petition is dismissed. It is so ordered."

This court's conclusion embodies these holdings. If the principal beneficiary makes the settlement payment and thereby upholds the will so that she will receive what was bequeathed and devised to her under the will, she should be entitled to charge the settlement payment against the capital account of the assets received. That does not mean that the taxpayer takes a loss in the year that the expenses are incurred. It means that, on a sale or other disposition, of any of the assets which taxpayer received under the will, taxpayer will be entitled to add a proportionate part of the settlement payment to the basis of the property (the fair cash market value of the property as established by the appraisers) for the purpose of establishing the adjusted basis. In the year of sale or other disposition, the amount of loss or gain, if any, will be computed by taking into consideration as an adjustment to the basis, the proportionate share of such settlement payment. Gain or loss is ascertained and recognized according to the capital gains or loss provisions of the statute. The loss would be the excess of the adjusted basis over the amount received. The gain would be the excess of the amount realized on the sale or other disposition of the asset over the adjusted basis.

Once the loss is determined to be a capital asset described within subsection ORS 316.320(1) (b), such loss may be used as a deduction in computing the net income for the taxable year in which the loss is sustained. Gains on the sale or other disposition of cap-

ital assets, whether or not such assets qualify as subsection (b) assets, are included in gross income pursuant to ORS 316.105. The crucial issue is whether an asset for which a loss is claimed is a capital asset within the purview of subsection (b) at the time of the sale or other disposition of the asset by the taxpayer.

It is the holding of this court that taxpayer, on her 1961 joint income tax return, can charge a proportionate part of the settlement payment to the adjusted basis of the inherited notes which she disposed of during the period of time between the receipt thereof and the close of calendar year 1961, for the purpose of computing the loss, if any, under the capital gains and losses provisions, and that the loss so ascertained and recognized will be allowed to her as a deduction for the purpose of computing net income in 1961. Notes paid prior to distribution and notes paid in years subsequent to calendar year 1961 cannot be considered by this court for the purposes of determining loss deductions on the 1961 joint income tax return.

Other authorities considered by the court are the following:

Chapter 25, "Deductions of Business Expenses", Vol. 4, Merten's The Law of Federal Income Taxation, 1960 Revision, contains an excellent discussion of the distinctions between business expenses and other expenses, including capital expenditures like cost of protecting ownership and cost of real property, and also the handling of expenses in connection with litigation, contested matters or disputes. In Vol. 5, Mertens, Law of Federal Income Taxation, 1960 Revision, Chapter 28, the following sections were con-

sidered by the court: Sec. 28.39 (losses distinguished from capital expenditures), p. 25; Sec. 28.12 (allowable loss is one of capital and not of potential income), pgs. 32-35; Sec. 28.78 (losses on the sale of residential property), pgs. 344-355, with particular reference to pgs. 353-355 (that property is acquired by inheritance is by itself a neutral fact in determining whether a loss upon its sale is deductible), citing *Estelle G. Marx,* 5 TC 173 (1945); Sec. 28.43, pgs. 181-183 (payments made in connection with, and the expenses of litigating rights relating to capital assets are ordinarily capital expenditures, representing part of the cost of the assets); Sec. 28.73, pgs. 331-338 (factors indicating operation as business or transaction entered into for profit); Sec. 28.05, pgs. 12-17 (necessity of actual loss to taxpayer); Sec. 28.06, pgs. 17-21 (loss must be that of the taxpayer); Sec. 28.15 (losses must be established by closed transactions), pgs. 38-50; Sec. 28.34, pgs. 129-141 (definition of a "transaction entered into for profit"); and Sec. 28.35, pgs. 141-146 (illustrations of transactions entered into for profit).

The allocation by proportionment of the settlement payment against the appraised values of all the assets owned by the decedent at the time of his death was elected by taxpayer on the joint 1961 income tax return. Taxpayer, as executrix, had control of the administration of the estate. Taxpayer was the principal beneficiary. Taxpayer made the settlement payment to remove any doubt about her right to inherit the decedent's assets, subject to the administration costs, claims, taxes and fees. The formula set forth by taxpayer in the return and described in the statement of facts is accepted by the court as the appropriate method of apportionment in this case.

Arithmetical computations are to be done pursuant

to Rule 37 of the Tax Court, to correct the deficiency assessment.

One struggling through tax statutes and cases grasps the meaning of the words of the ancient Chinese philosopher who, it is reported, said: "He who seeks to reduce the claim of the tax collector must light the path of deduction through the dark maze of the law". One might add: "And hopes he lit the proper lights so that others may choose to follow that way".

A decree modifying the order of the commission is to be entered in accordance with this decision.